The United States Court of Appeals to the Federal Circuit is now open and in session. God save the United States and this Honorable Court. Good morning all, this is Chief Judge Prost. I now call up case number 21321, National Organization of Veterans Advocates v. Secretary of Veterans Affairs. As Mr. Lichtenberg referenced and as counsel know, the hearing will take place in two parts. The first part is 20 minutes for the standing question, which was the subject of supplemental briefing last month. The 20-minute time frame will be divided equally with NOVA going first and Mr. Martinez has reserved two of his 10 minutes for rebuttal. The first two minutes for each side will be uninterrupted argument. The remainder of the time will be open to questions from the court. Now in contrast to the second part of the argument today, in which all judges may participate in questioning and we will be called on for questions in order of severity, we're trying to keep this part on standing a bit simpler. So three of our judges, Judge Dyke, Judge Taranto, and Judge Chen will be called on to ask any questions they may have for one or both sides on standing. When this standing section concludes, we will move on to the nearest argument and which I will describe in a bit more detail when we get to that point. Mr. Martinez, the floor is yours. Good morning Chief Judge Prost and may it please the court. For two decades, this court has recognized NOVA's right to protect veterans by challenging unlawful VA action. This case should be no exception. Four quick points about standing. First, NOVA has associational standing here under any conceivable standard based on our veteran members, Mr. Cianchetta, Mr. Tangen, and Mr. Regis. All three satisfied the injury and fact requirement when NOVA filed its petition in January and all three continue to satisfy it today. And there's no doubt this case is germane to NOVA's mission of helping veterans and their advocates. That's what this court held in DAV v. Gober and it's only confirmed by Ms. Rauber's uncontroverted declaration. Second, although VA says that Gober's injury and fact analysis was wrong, you shouldn't reconsider Gober in this case. Gober took a broad view of veteran standing but we can win here under our narrower point that we have standing based on the concrete harms facing Cianchetta, Tangen, and Regis. If you want to re-examine Gober's injury and fact analysis, you should do it in a case that concretely turns on that analysis. You should also do it in a case where the parties have fully briefed the Gober issue, which is nuanced and complicated. That didn't happen here. VA didn't challenge our standing initially and your supplemental briefing order to the parties didn't question Gober's validity. Third, whether it's in this case or later down the road, you should be clear that at the very minimum, veterans with live disability claims have standing to make claims, including any procedural or structural rule broadly applicable to the disability claims process. That approach is consistent with the result in Gober and also with finding standing in the Appeals Modernization Act cases that were argued yesterday. And finally, you should recognize that if VA's standing argument is accepted, it would be virtually impossible to use review of VA rules before those rules inflict unnecessary harm on veterans. Article 3 doesn't require that result. NOVA has standing and this case should proceed on the merits. Judge Dyke? Thank you, Chief Judge Prost. Mr. Martinez, on the subject of Gober, I wonder if our panel decision went too far in recognizing that an organization such as NOVA has standing when it has a veteran member who might potentially be affected by the regulations. I wonder whether something more isn't required to satisfy the injury in fact requirements, such as in that case, establishing that the organization had a veteran member who had a pending Q claim. And so my question is, isn't our decision at Gober perhaps a bit too broad in recognizing standing based solely on veteran status? Your Honor, thank you for the question and two points on that. First of all, I just want to reiterate, we think there is, you know, the VA has raised questions about Gober's breadth and I think although those are questions that are questions to ask, I don't think you need to reach that question. But I want to answer the point that you're asking me about. I just want to confirm that we don't think you need to reach that in this case because we clearly have standing based on our three veteran members. With respect to whether Gober was too broad, I think the Gober standing holding was clearly correct in finding that NOVA had standing in that case because of the veteran, because of the fact that the rule at issue there, which affected sort of the VA disability claims process. As you noted, Your Honor, it affected the standard for reconsideration of Q claims. And we think that's the kind of sort of broad structural or procedural type of rule that any member or at least any member who has a live disability claim should be able to challenge. So we think to the extent that that's what Gober held, we think that's correct. And to the extent that there are questions about, you know, maybe whether there was language in Gober that went a little broader than that, we just don't think that that issue is really squarely presented in this case. And I think if you wanted to reexamine that, we would respectfully suggest that you do it in a case where it actually matters and where the parties have an opportunity to really brief the outer edges of standing and the outer edges of Gober in a way that they haven't done so here. Judge Chilanta? Thank you, Chief Justice Prost. Mr. Martinez, I have two factual questions which I want to follow up with a legal question or two. So the first factual question, do I understand correctly that NOVA now has a bid under 300 members? No, Your Honor. We have, I think, between 500 and 600 members. And a significant portion of those are veterans. Okay. And under the bylaws, Article 3, is it right that being a veteran, let alone a benefits claim that is not part of the membership criteria, that's focused on being a practitioner before the VA or Veterans Court so that an authorized representative to advocate for veterans can be a member even if not a veteran while a veteran cannot be a member if not an authorized advocate? I think, Your Honor, that it's true that non-veterans can be members of NOVA. I don't know, I don't want to definitively say one way or the other whether a non-advocate who is neither a lawyer nor a veteran's advocate can be a member. But certainly, NOVA has members who are not veterans themselves. Okay. Well, as I read the bylaws, this is an organization of practitioners or intended practitioners before those two forums. And being a veteran, the word happenstance is obviously not quite right since it probably is something of a correlation between being an advocate and a veteran. But that one does not, in fact, have to be a veteran and veteran status, I'm going to then just assume for current purposes, is not actually part of the membership criteria. And that actually leads me then to the question of whether that should matter for associational standing. That is, here, the three NOVA members' status as veterans with interest in benefits, which would, by assumption here, give those members their own standing. Should it matter that their injury is in a role, namely as veterans but not advocates, that's immaterial to the membership criteria in this restricted membership organization? And what case, if any, of the Supreme Court involves that kind of situation? So, Your Honor, I think a couple of points there. First, just to maybe go back to revise my answer because I've looked at the guidelines, the bylaws. I think there are certainly support staff and law students and others who are not lawyers who can be members of NOVA. So just to answer that earlier question. With regard to whether it's happenstance or whether happenstance is enough, I think that, first of all, it's not happenstance because of the fact, of course, that veterans who are advocates are drawn to advocate for veterans' causes. That's part of the reason why they take up this field of practice. That's part of the reasons why they join NOVA. I think, though, that this Court's test for associational standing gets at the idea that maybe you're main this requirement, which is in addition to the requirement that an individual member of the organization has standing. And so the way that the Supreme Court's doctrine has set this up is there's essentially two Article III requirements for associational standing. One of them is simply that you have a member who has standing. And that we would satisfy by virtue of the veteran members. And I don't believe the Supreme Court has ever suggested, and I don't think VA has ever pointed to a case saying, linking that prong of the analysis to anything more than just having a member who would have Article III standing in his own right. I think the question of whether this is really an appropriate case for this particular organization to be advancing the interest and protecting against the injury that those members would suffer, I think that's Mr. Martinez, can I just follow up that piece, and then I'll be done on the standing issue. So some of the cases, I think, talking about germaneness or other particularly germaneness, make some sort of inquiry into possible divergence between an organization and the individual members whose own injury would give the individual members standing. And I a divergence between an organization of advocates who are interested in the future pool of potential clients and those of individual veteran claimants who are interested in their own particular claims. One possible example of that might be NOVA's choice in this case to declare the two rules that issue to be interpretive rules, thereby setting up the need for a ruling about whether what exactly that means in under 552A, but giving up the contention that they're actually substantive or legislative rules which would indisputably come within 502 jurisdiction. So I guess I'm interested in, again, under this germaneness heading, whether an organization of advocates might have a divergence from the underlying interest of a member. Well, Your Honor, honestly, I find it hard to imagine that that would be the case, but I don't think we need to speculate in this case because I hear it's absolutely clear that there is no divergence. And we know that from the declarations that Chanchetta, Tangen, and Regis have submitted. I think the final paragraph or so of those declarations makes clear that each of those three veterans have said, if for whatever reason, the court thinks that NOVA doesn't have and basically, you know, allow us to join the case for purposes of standing, and they've also said that we're willing to adopt all of the arguments that NOVA has made, and both in writing and at oral argument, if you require us to do that. So even if theoretically, there could be some sort of divergence of interest, we know as a factual matter that there's no divergence of interest here because all of those veterans have specifically said they endorse our arguments, and if necessary, they would join the case. And I think that's just maybe the final point on this just to close it off. I really don't think there's a germaneness problem. There's certainly not one under the precedent in Gober, and that aspect, the germaneness holding in Gober is not something that VA has called into question, or that they've cited any subsequent case that undermines it or anything like that. We don't think there's a germaneness problem, but if in the event that the court concludes that there is a germaneness problem, I think the solution here would be simply to exercise its discretion to allow us to bring those veterans who clearly indisputably have standing based on their own facts into the case. And I think that would be fair. Thank you. Joel, welcome to your rebuttal, which we will certainly restore your two minutes, but I wondered if Judge Chen had a question for you or if he'd like to wait and withhold and ask the government a question. Yes, Chief. Thank you. I have many questions, but I'll just stick with one, one simple one. Mr. Martinez, you mentioned in your supplemental brief somewhere that events that occur after the filing date of your petition can cure a standing deficiency with your petition as filed. Is there a Supreme Court case you have that supports that view of post-filing date events curing a standing deficiency? Your Honor, I think what we did in the reply brief was rely on this court's decision in Prasco. I don't recall, I don't think that there is a Supreme Court case squarely holding that, but I think Prasco is good law in this circuit, and I think it's consistent with what the majority of other circuits have in fact done. I think there's a recent Law Review article that talks about this. And so I think based on, you know, I know there are a lot of precedents up for I don't think anyone has suggested that Prasco is wrong, and I don't think there's any need to reexamine that. And so I think if you had to rely on the facts that occurred after the petition was filed, I think the fair thing to do, especially in light of the fact that you'd be reconsidering your precedent in Gober, would be to treat our supplemental filings and declarations to do that. I don't think it's necessary, just to be clear, because I do think that the veterans, the three veterans that we've pointed to, all of them had standing as of the time that the Mr. Ciancietta had a knee surgery, a partial knee surgery schedule. It was certain that he was going to have that surgery. And he's a veterans lawyer who has a longstanding disability rating for his knee. It was also certain he was going to file the claim, as he has now done. The other two veterans as well had either a claim pending under the rule that were challenging, or a claim that had been denied under the unlawful rule that were challenging. So I think even as of January 2020, we were okay. Thank you. We will restore you two minutes of rebuttal. And now let's hear from Mr. Breskin. And again, he will have two minutes to start off with uninterrupted before the questioning begins. Mr. Breskin. Good morning, and may it please the Court. NOVA does not have standing to challenge the knee provisions in the manual. In its 20 pages of briefing, and again in argument today, NOVA has attempted to establish its standing in several different ways, but none have been successful. NOVA has argued that it has self-evidence standing from the record, and can rest on mere allegations because the Court afforded it associational standing some 20 years ago. But even NOVA doesn't really take this position seriously, because it's submitted evidence as required by Phygenics, and makes no real mention of self-evidence standing in its reply brief. NOVA also argues that it has associational standing because its members are harmed, because they may earn lower contingency fees from veterans of claims affected by the knee provisions. But NOVA provides no support for this theory of lawyer standing, which if adopted, would give lawyers and law firms the power to challenge any agency action that might conceivably affect their pocketbooks, however indirectly. The zone of interest rule exists to prevent such claims, and it precludes NOVA, an organization of lawyers and advocates, from challenging VA action clearly concerned with veterans, not lawyers. NOVA also argues that three of its But none of those attorneys had concrete, certainly imminent harm traceable to the knee provisions at the time the petition was filed. NOVA's reliance on its attorney members, who are also veterans, also runs headlong into the second prong of the associational standing test, as Judge Stronto's questions previewed. NOVA fails this second prong of associational standing because its stated purposes are not to do what is best for veterans, but to serve the interests of its members, who are attorneys and veteran advocates. NOVA suggests nevertheless that its interests align with the interests of veterans, but NOVA's bylaws make clear that its focus is on advancing the interests of its members as attorneys and representatives, not as veterans. Indeed, NOVA primarily argues that its members' interest here is in their contingency fees, but those fees are paid by veterans from their past due benefits. So the interests of NOVA and veterans will often diverge. Finally, NOVA makes only a cursory attempt, it has not mentioned today, to demonstrate direct standing, but has not established that the knee rule's inhibited stated mission does not therefore have direct standing. And I'll finish quickly on the question that Judge Chen asked about whether or not NOVA can cure. The Prasco case makes clear that the and had established that its members already had direct standing at the time of the petition that was filed. The Prasco case concerns supplemental or amended complaints, and it says that standing is to be determined at the time of the operative complaint. The operative petition here is January 3, 2020, and so the supplemental briefing and declaration submitted cannot cure under the only test that NOVA has identified for the court. Judge Dyke. Thank you. I have two questions. The first, Mr. Bruskin, is a hypothetical. Let us assume that Messrs. Regis, Tangent, and Ciancietta today filed a challenge to these two manual provisions. Would they have standing to do that? Mr. Ciancietta, I believe, would because he has a now pending claim that is likely to be affected by the rule. Mr. Regis likely would as well because his claim is now before the regional office. Mr. Tangent, I think, is a more difficult question because he has only stated in his file a claim in the future, and that runs into problems laid out in the various Supreme Court cases that talk about speculative future harm. Okay, so if that is true, why would not amending the petition for review to add these three individuals as petitioners solve any standing problem? It could, Your Honor, and that is what PRASCO sets forth. If a new petition or complaint is filed, then the court looks at standing at the time that that petition or complaint is filed, but what it does not do is look to evidence that develops later or later events to determine whether or not the original petition has been cured. Smith v. Sterling in the Laid Law case made clear that standing has to be established at the time the petition was filed. Judge Taranto, if Judge Dyke has no follow-on, I will go to Judge Taranto. Sure. So what overcomes the simple logic that increasing veterans' benefits is a purpose of NOVA under the kind of catch-all item 5 in Article 2, I guess it is, which would then be germane to the subject of the benefit claim of Sanchedo Regis and Tangent? Well, I am not sure that that cures the germaneness problem because that basically says that one of the purposes of NOVA is to do whatever it is that will advance 1 through 4 in those bylaws. Those bylaws' purposes are focused on developing its members' understanding of the law, encouraging high standards of service, conducting courses of study, and providing opportunities for an exchange of certainly advocate in the veterans' benefits sphere. I do not think that that catch-all cures the germaneness problem. And the reason that is, is because if a law firm does not have standing to pursue on behalf of its clients certain challenges to agency action, then it attorneys should not be able to do so simply because they put into their bylaws a catch-all provision that they rely on. Can I ask one more question? You raised the zone of interest inquiry. Where does that inquiry fit into the test for associational standing? I think it fits at the first prong of associational standing where NOVA is arguing that their members as attorneys and advocates have an injury in fact, and the court has looked at whether or not the entity or the individuals in the association fall within the zone of interest of what they are challenging. Just to be clear, that particular zone of interest argument is not one that affects the standing based on Ciencietta, Regis, and Pangan. That is correct, Your Honor. It is solely directed towards the notion that attorneys can file direct review against VA action, which does not concern attorney's fees. As the court heard yesterday, the government is not contesting the sort of zone, did not raise a zone of interest concern with respect to Carpenter Charter's challenge to regulations that govern attorney's fees because obviously, there is more of an alignment of the zone of interest. But here, for the manual provisions, the regulatory and statutory underpinnings do not concern attorney's fees. Attorneys fall outside the zone of interest. Thank you. Kent Chen. Yes. Just taking the facts of Mr. Ciencietta, I just want to know and understand a little bit better. You seem to have this bright line rule that there needs to be a claim on file with the VA. And if all the facts on the ground are quite clear that Mr. Ciencietta is about to undergo partial knee replacement surgery and now he's going and he says that this is all related to his service and he intends to file a claim, I guess what more is needed? It doesn't feel like there's the same kind of chain of speculative possibilities that the Supreme Court has criticized before when it concluded there was lack of standing in other kinds of cases. Well, I think there is still speculation built into it. One, not just because he doesn't have a pending claim as of that date, but he had not had the surgery. Simply being scheduled for the surgery doesn't mean that ultimately you will have it. It doesn't mean ultimately that you will display the necessary disabilities to make a claim. So, I think the speculative nature of it is still present even if there is an affidavit to the effect that, you know, I anticipate having this surgery and I anticipate making a claim for benefits. I think another point that we would make in response to that question, Your Honor, is that the declaration from Mr. Ciencietta and the others are rather conclusory. And I think that in most of the cases that we've heard, it's more than simply a statement that I intend to do something or I'm exhibiting an injury and that's good enough. And so, we would suggest that Phygenics requires more than what has been presented, even in Mr. Ciencietta's case. Anything further, Judge Schen? No, that's fine. Thank you. Thank you. Thank you, Mr. Breskin. We'll now turn to Mr. Martinez for two minutes of rebuttal. Thank you, Your Honor. Just three quick points. First of all, with respect to the three veterans as of January 2020, I think it's clear Mr. Ciencietta, I mean, Mr. Ciencietta had the surgery scheduled and he knows his rights. He was clearly going to file for the increased rating. I think if standing doesn't exist for him, I think that standing is not going to exist for a lot of people and that's just not consistent with how this court has applied the test. It requires a realistic danger or a substantial risk of injury and he certainly had that. Mr. Regis as well, he actually had a pending claim. It was just pending at the board. He was seeking a remand so that he could have the knee stability issue addressed by the RO. His claim was actually pending. Of course, he was harmed. And Mr. Tangen had already been rejected under the unlawful rule that we're challenging. The government seems to suggest that he should have filed a claim that would have been futile and foreclosed under the VA's existing interpretation of the manual. That doesn't make any sense. He was suffering harm in January 2020 because he was being paid less in disability benefits than he deserved under law. Secondly, Your Honor, with respect to the germaneness, I just want to emphasize the germaneness holding from Gober has not really been challenged and there's no subsequent case law that has undermined it in any way. The bylaw provisions that Mr. Breskin is trying to re-argue have already been conclusively interpreted by this court to find that this kind of litigation is germane. But even beyond the bylaws, the bylaws aren't the only thing that matter. We have Ms. Rauber's declaration which makes clear over and over again that NOVA's purpose goes beyond helping advocates. It also also concerned with helping veterans themselves. And that's not just a statement that's borne out the extensive litigation and policy advocacy that NOVA does on behalf of veterans. Finally, Your Honor, with respect to supplementation, we asked this court on page 15 of our supplemental brief to allow for amending the petition if needed to draw in these additional petitioners or additional allegations. I don't believe the government even addressed that request in its response. And so we think it would be entirely appropriate exercise of this court's discretion, especially given that under a fair reading of Gober, we had standing under that precedent, that if you want to sort of reconfigure the standing requirements, that you allow us to supplement or amend the petition as needed to show standing based on the three veteran members. Thank you so much, Your Honor. Chief Judge Brez, Ms. Judge Dyke, could I make one comment to Mr. Martinez? I mean, if I were you, I would consider filing a new petition on behalf of Mr. Regis, Mr. Changin, and Mr. Chinchetta and ask to consolidate it with the pending NOVA petition to eliminate, as the government concedes, some of these standing issues, which may be difficult. Thank you, Your Honor. We will take that suggestion under advisement. And we appreciate, of course, the government's concession that there is standing to challenge both of the rules from at least two of the three veterans, if we were to do that. Thank you. That concludes the initial portion of the argument today. We'll now move on to the merits portion of this en banc argument. And this is how it will work. Each side will have a total of 55 minutes. Petitioner has reserved eight minutes of that for his rebuttal. Each side will begin with three minutes of uninterrupted argument, followed by two rounds of questioning from the en banc court. The first round on each side will involve my calling on judges in order of their seniority. In the first round, each judge will have three minutes. That time is planned to cover both the question and the answer. After we complete the roster for the first round, we will have a second round for judges with additional questions. Again, we will go down the roster and I will call on judges in order of seniority. But on this round, there will be just one minute allotted for each question and answer. There may, of course, be some flexibility in that timeframe if judges pass on asking a second round question. We will follow this process first with Martinez's rebuttal time where judges will be free but on their own to raise any remaining questions. That's the plan, so let's begin. Mr. Martinez. Thank you, Your Honor. Section 502 provides an essential check when VA issues illegal rules that hurt veterans. It authorizes this court's pre-enforcement review both of legislative rules and of interpretive rules and policy statements. In doing so, 502 promotes the prompt and efficient resolution of pure legal questions with broad significance while avoiding the need for individual veterans to litigate those questions through the painfully slow VA claims process. Here, NOVA is challenging two knee disability rules in the adjudication manual. Both rules are unlawful. One of them instructs VA officials to ignore this court's express holding in Hudgins v. McDonald. The other adopts an arbitrary and unbiased for assessing knee joint stability. VA wants to block the court from even looking at these rules, but none of its threshold procedural objections has merit. First, the new rules are covered by 502's cross-reference to FOIA Section 552A1, which refers to interpretations of general applicability. VA concedes the new rules are interpretations and they are of general applicability because they apply generally to anyone seeking VA benefits, not just to particular named individuals. That interpretation tracks the ordinary and administrative law meaning of general applicability that's been reflected in federal law for almost a century. VA says an interpretive rule can't be of general applicability unless it's binding, but that argument has no basis in the statute's text or history, and it's directly at odds with the Supreme Court's decision in Alena Health and with Blackletter Administrative Law. In any event, the new rules here are undeniably binding. On the regional office staff who issue VA's final decisions in 94% of all disability claims. Second, Section 502 also authorizes review of interpretive rules through its cross-reference to APA Section 553, which directly refers to interpretive rules twice. Section 553 does not implicate FOIA's publication requirements and is the simplest and most straightforward way to resolve this case in NOVA's favor. Third, although finality is not a separate requirement of 502, the new rules are final in any sense that might matter. They reflect VA's conclusive decision on how RO staff must interpret and apply the new regulations in every case. Any veteran whose claim is denied based on the new rules has suffered an adverse legal consequence directly attributable to those rules. Finally, this case is timely. Everyone agrees Congress subjected 502 actions to Section 2401A's six-year statute of limitations. Because Congress made that choice, Rule 15F's 60-day time limit is invalid. This court cannot enforce a local rule that shrinks the statutory window for veterans to file their claims by nearly 97%. The bottom line here is that VA can't hide behind threshold procedural objections. This case should be heard on the merits. Thank you. This is Chief Judge Prost. Let me ask the first question, Mr. Martinez. So if you recognize the government's argument emphasizes that while the RO is required to follow the manual, that matters little as the agency's final word is the BVA and the veteran can get BVA review of any RO determination if he or she wishes. You point out, however, the facts on the ground. You cited this morning in your argument the 94%. That is a practical matter for million and a half annual claims. Only a minuscule percentage of those cases are actually appealed up to the BVA. So the RO determination is almost always the final word. Hopefully, the small numbers of appeals to the BVA reflect that veterans are satisfied with RO actions. But leaving that aside, would your position be different then if the numbers were flipped? In other words, if 94% of RO determinations were in fact appealed to the BVA, would that change your view of this case? I don't think it would change our view of this case because the 94%, I think, is a very powerful practical illustration of what VA itself conceded were the far-reaching, and this was in the gray and DAV cases, the far-reaching effects of the manual. But I think even more important than the practical point is the legal point, which is that ROs under 38 U.S.C. 7105C are authorized and empowered by Congress and by the agency to issue final decisions, legally final decisions. And so I think even if the numbers were reversed, if that statutory provision is still there, which says that the RO is the entity that can issue the final decision on behalf of VA, that itself, you know, has an enormous effect and triggers legal consequences. I also think the other broader point here is that the whole question of whether the manual is binding either on the RO or on the board really isn't here or there with respect to statutory language at issue, which talks about in 552A1, which talks about statements of general policy or interpretations of general applicability. That requirement, interpretations of general applicability, has nothing to do with whether an interpretation is binding on this particular agency official or that particular agency official. And we know that because the history, not only the plain meaning of that language, but the history of the word, of the phrase general applicability, is rich in the administrative law context. The Federal Register Act in 1935 used that phrase. And immediately afterwards, regulations were issued that remain in the very first provision of the Code of Federal Regulations, 1 CFR 1.1. And they make clear that what general applicability means is it's referring to statements that are relevant or applicable to the general public, the members of a class, or the persons of a locality as distinguished from named individuals or organizations. That's the current regulatory understanding of the phrase general applicability. That has nothing to do with whether it's binding. Thank you. I'm sure you'll have further time to discuss this with my colleagues. So let me call on Judge Newman. Well, thank you. Counsel, counsel opened this argument by saying that this avoids the delay of the claims process. And that, it seems to me, is certainly a very powerful point to have in mind if, in fact, we're doing that, that in terms of the general applicability, the way things are now, and probably even if the three veterans are joined as parties in this action, they would still have to go through the entire claims process as applied to them. Well, that's really my question. How do you see this working? Yes, Your Honor, I think it's true that any individual veteran to take advantage of the, you know, a victory for NOVA in this case would have to file a claim. But the difference is that if we win this claim, the case, this court would have reaffirmed, for example, with respect to the knee replacement rule, would have reaffirmed the decision it already made in Hudgins v. McDonald, which means that someone like Mr. Ciancietta with a partial knee replacement, it's going to be a very easy adjudication by the RO, because the RO is going to know, because this court will have told it now twice, that partial knee replacements count and are if this case wasn't brought, what would happen is Mr. Ciancietta would file his claim in the RO, and it would then be denied because the RO has been instructed to ignore this court's decision in Hudgins. And so that case would be, that claim would be denied, he would then be forced to appeal to the board. And he would have to litigate the issue in the board in front of the board, which even though not technically bound by the manual, we all know from how the board issues decisions that the manual exerts a very powerful gravitational pull. And the upshot of this is that it's going to take on average five and a half years for a claim to be resolved that goes through both the regional office and the board. Mr. Ciancietta would be deprived of, and people like him would be deprived of benefits for that time. And when we're talking about the knee rule, these are very significant benefits. In the first year, it probably amounts to something like $25,000 or so of compensation for a veteran who's been disabled and who's entitled to benefits, both under the regulations and under this court's decision in Hudgins, and who is being deprived of those benefits simply because the VA has decided to insert a provision in its manual. And Mr. Ciancietta is unfortunately not the only one. This kind of surgery, partial knee replacement, is very common. And so I think it really does make an enormous practical difference whether the RO is going to be forced to follow this illegal rule or not. Thank you. Judge Lurie? Judge Lurie? No questions at this time, Chief. Thank you. Judge Dyke? Thank you. So, Mr. Martinez, I have a question about the knee replacement rule, which, as I understand it, was earlier published in the Federal Register. And I wonder, given that circumstance, whether the republication of that rule in the manual gives this court authority to review the manual as opposed to reviewing the Federal Register notice. Now, that might be solved in this case by amending the petition for review to challenge the Federal Register notice. But so my questions are twofold. One, is the articulation of the rule in the Federal Register in the manual the same, though the language is somewhat different? And two, if that's correct, shouldn't we be reviewing this rule based on the Federal Register notice rather than the republication of the manual? Thank you, Judge Dyke. A couple comments on that. First of all, we don't think it's the same because I think what the manual is doing is not only is it sort of instructing people to apply the interpretation that was in the Federal Register, but it is interpreting this court's decision in Hudgins. And you can see that from the analysis that VA undertook when it put it in the manual. I think it's at page 160 of our appendix. They're basically interpreting the Hudgins decision to somehow turn on, you know, to basically create a different rule for claims that were pending before that Federal Register guidance was put in place and claims that had not yet been brought. And so we think that is very clearly an interpretation. It's an interpretation of the Hudgins decision and of general applicability. We also think it's an interpretation to the extent it incorporates the regulatory change that was in the Code of Federal Regulations. We also think it's an interpretation in that sense. I think the second point I would make though is that, you know, it does seem possible that we could, you know, in theory bring another challenge to the regulation that was put in the Federal Register, which again was designated as an interpretive rule at the time. But that just sort of proves the kind of absurdity of this case because that exact regulation was considered by the court in Hudgins. This court in Hudgins, the VA came forward and said, look, you should agree with us in Hudgins because we have this regulation that's in place and you should defer to it. And the court looked at the regulation. It said that the regulation was not entitled to deference because it was inconsistent with the agency's past practice. And it said that it was also wrong because based on the language of the underlying regulation, the diagnostic code and the pro-veteran canon, the correct interpretation, the best interpretation of the diagnostic code is that benefits are granted to people who have partial knee replacements. And so in theory, we could bring another challenge to that regulation, but we think the court has already conclusively looked at that regulation, the regulation from I think it was 2015 or 2016 and said that it misinterprets the diagnostic code. And VA can't be allowed to just get around that express holding by this court by putting a provision in its manual that tells people essentially to ignore the decision in Hudgins. But do you agree that the simple republication of a rule doesn't create a new opportunity for judicial review? I think that's a harder question. I think if it were literally just a republication, I think maybe not. But in this case, as I was saying, I do think that you have more than that because this is really about an interpretation of Hudgins, which goes above and beyond just the republication of the interpretive guidance. Thank you. Judge O'Malley. Thank you, Steve. You mentioned finality, and it's clear that in Ashford we said that the VA action being challenged has to be a final agency action. So, my question is, from what perspective are we to consider finality from the perspective of the RO, from the perspective of the board, or from the perspective of the benefit-seeking veteran? I think, Your Honor, the finality question needs to be considered from the perspective of the agency action that we are challenging and whether that satisfies the finality requirement. Now, I'll just bracket the fact we think respectfully we disagree with Ashford's holding that the two-prong Bennett v. Speer test for finality applies here. But even assuming that it applies, I think the way to apply that test or to consider it would be to ask yourselves whether the manual provision reflects the consummation of the agency's decision-making process. And we say absolutely it does because it conclusively instructs RO adjudicators to apply the unlawful interpretation. And there's no question that that is VA's official position. And then the second question is whether legal consequences flow from that. And we think legal consequences plainly do flow from that because, as I was saying earlier, the RO decisions in the vast majority of cases are legally considered final decisions under 38 U.S.C. 7105C. And they also have other consequences as well. And so, I think from that perspective, I think both prongs of Bennett v. Speer would be satisfied. Although, as we said in our brief, we don't think that the two-prong test should apply. So, is your answer to my question that we should be looking at finality from the perspective of the veteran seeking benefits? Because the board is obviously not bound by the agency decision. And the RO officer, at least to some extent, could recommend changes to the manual. So, wouldn't we have to be-wouldn't it have to be, you know, door number three? I guess, Your Honor, I think the way that I would conceive of it is whether under Bennett this manual provision is the consummation of the agency's decision-making process with respect to what are the-what interpretation does the RO have to apply? And I think the answer to that would be clearly yes. And then the legal consequences then flow from that. Judge Rayna. Judge Rayna? Okay. Yes, I had to unmute. Sorry. Mr. Martinez, in yesterday's arguments, we heard that there's been a significant amount of revisions to the manual year-to-date. And, in fact, I think I heard something like 175 revisions. If we were to grant your claim, aren't we looking at a potential flood to this court's docket of pre-enforcement challenges? And wouldn't that undermine agency determinations? But more important, wouldn't that also hurt the veterans in the long run? Because it seems to me that that interpretation could implicate the pro-veteran canon in that regard. And more important, isn't the court deprived of an adequate legal and factual landscape upon which to determine cases and controversies, in this case, the harm to the veteran? Your Honor, a couple points on that. First of all, I think that the fact that VA makes a lot of changes to the manual shouldn't concern you. Presumably, I think VA would probably say that those changes are legally valid. And so it's not clear to me why we should imagine that every one of them is going to be challenged. I also think that many of those changes may have to do with things that don't fall within 552A1. So I don't think that point necessarily holds. With respect to what would help veterans, I think the answer is that the way veterans would be helped and what Congress thought would help veterans was creating the ability to bring these kind of pre-enforcement challenges to VA rules. And the reason that helps veterans is because these challenges are always going to present pure issues of law that don't turn on any particular veteran's facts. And so they're going to be teed up. They're going to be right for review. And this court can decide them essentially on legal grounds. And the reason that helps veterans is because you will get a determination earlier after the unlawful rule is promulgated, which will then allow veterans and the VA, when it's adjudicating individual claims, to apply the correct rules earlier in the process. If you don't allow that, then each of these things is going to have to be litigated on an ad hoc basis case by case we've talked about. You know, it's five and a half years to get something through the RO at another year or so if you're going up to the veterans court. And if that's the mechanism by which these pure legal challenges are adjudicated, you're going to have, you know, five or six years worth of adjudications and precedents and RO decisions and board decisions that are built up that could very well be under an unlawful understanding of the rule. And so that's a lot of eggs that are going to have to be unscrambled if at the end of the day, this court takes the case and concludes, hey, this rule was invalid in the first place. And so I think Congress recognized that. And that's why it expressed its preference for pre-enforcement review of these kinds of rules. And that's why I think this court would, although there may be, you know, an uptick a little bit in this court's docket, I think, you know, this court has been empowered to protect veterans in precisely this way. And I think by doing that, you're going to streamline the kind of litigation that's going to have to happen in front of the VA and in their disability claims process. Okay. Thank you. Judge Wallach. I don't have any questions for this party at this time. Thank you. Judge Toronto. Thank you. I want to, Mr. Martinez, change topics and ask about the Rule 15-2401 issue and what seems to me, or has seemed to me, the heart of the issue. So Section 2401, by its terms, says only that a filing beyond six years is untimely. It doesn't say that every filing within six years is timely. And a rule requiring a filing in less than six years is not inconsistent with the meaning of 2401's words. And without inconsistency, Rule 15 is authorized by 2071. So I think your 2401 inconsistency argument, sensibly enough, depends on characterizing 2401 as going beyond its literal meaning and embodying a congressional judgment that any filing within six years is timely. That's exactly the kind of characterization that the Supreme Court in Petrella and FCA Hygiene expressly gave to the context-specific time provisions for copyright and patent cases. So my broad question is this. Why is that a proper characterization for 2401, which is a general default limitations provision applicable to the entire range of actions against the United States government not covered by another provision, where Congress wasn't making a judgment about any specific context at all, such as a rule challenge context, in which, as far as I think anything I've seen, nothing suggests Congress normally, if ever, allows six years or anything close? Well, Your Honor, a couple points on that. I think most importantly, I think it is fair to look at the six-year statute of limitations as embodying Congress's judgment. And I think that's why this court has said that that six-year statute of limitations applies. I think there's generally a presumption in statutory construction that Congress legislates against the backdrop of U.S. code. And here, the U.S. code provision provided the off-the-shelf statute of limitations six years that applies to APA actions and applies generally to suits against the government. And so in that context, when Congress steps in and creates this right to pre-enforcement judicial review, it doesn't need to say anything further because there's already that background principle that applies based on its terms to this particular type of case. And so I think that does reflect Congress's judgment. And I think ordinary principles of statutory construction would say that, you know, you need to look at what Congress did there and say that they understood what they were doing and they understood they were legislating against the backdrop of 24-01-A. Mr. Martinez, can I interrupt? Superphones make it impossible for lawyers to hear when judges are trying to interrupt them, I'm afraid. But let me try to the words of 24-01. Say only that if you file beyond six years, you're untimely. They do not say that everything within six years is timely. So to get to your point, you need to find a congressional judgment implicit in those words, never mind that they apply in every context, not otherwise covered. But the congressional judgment in that, in underlying this statute, that everything up to five years and 364 days is being declared to be timely, which is what I think the Supreme Court said in Petrella and SCIA hygiene. I guess what I'm trying to understand is why one would assume that to be the case for a general default provision in which Congress's attention is not focused on any specific type of claim at all. I think because 24-01-A, although it's a general default provision, it's the general default provision that is universally recognized to apply to APA claims. And Congress here was clearly trying to essentially create a mechanism for APA-like review of VA agency actions. And so I think in addition to the general presumption that Congress was aware of that provision, I think it makes perfect sense for Congress to apply the same, you know, APA statute limitations that appears in 24-01-A to this kind of claim. I think the only last thing I'd say is that I do think that these types of arguments could have been made based on the text and were made based on the text in both Petrella and SCIA. And I take the point that in those cases, the statutes appeared within the patent statute and within the copyright statute, but I don't think there should be any difference here given that 24-01-A is the background and that 24-01-A is almost universally acknowledged to apply to APA cases, sort of like the ones that Congress authorized here. Judge Ken. Thank you. I'm interested in, well, I have two different questions, but my first question, I think, is a follow-up to what Judge O'Malley had been asking about how to think about final agency action in this context with respect to the manual provisions. As I understand it, you're describing how a final agency action is the confirmation of an agency's position from which legal consequences will flow. And I understand that you've identified that 94% of the time when the RO denies a claim, that is the final agency decision because the claimant doesn't pursue an appeal to the BVA. But that makes me wonder about the overall structure of the VA's benefits claims process. It's created a system of two-level review. And what we're exploring right now is how the manual really only binds the first-level review. And so what I'm trying to understand is why is it final agency action to have these manual provisions when they only control non-final first-level adjudication? You can't go to the courts after the RO denies your claim. You have a right, however, as a claimant to appeal to the BVA. If you elect to abandon that right by not appealing to the BVA, then of course your RO decision becomes final. So I guess what I'm wondering is why can we say that these manual provisions represent final agency action when they don't control the final adjudicators, the board, but they only control this first-cut, first-level review non-final adjudicators? I think the answer to that, Shen, is that the way that the structure and the statute sets up the scheme, the entry-level adjudicators are also final adjudicators by law, not just by the fact that they happen to be the last person who issues the last word in 94% of cases. But those adjudicators are empowered to issue absolutely final decisions. And so in some ways it's analogous to a district court that... The claimants specifically have a right to have the second-level review adjudicators review that first-level decision, right? That's right, but that's also true in the context of ordinary litigation in district court. I don't think anyone would dispute that a district court issues a final decision with legal consequences flowing from that, even though there's an option to take an appeal to the Court of Appeals. And the Court of Appeals might not be bound by the rules that were applied by the district court in the same way, especially if the Court of Appeals is en banc. And so I think ordinary principles of finality recognize that when the adjudicator, here the RO or by analogy the district court, has the ability to finally and conclusively resolve the claim on behalf of the agency, that that finality is good enough. And I think I don't see any reason why to depart from that principle here. Okay, my other question is, there's a lot of agencies out there and they all have manuals. And I'm trying to explore what are the limits of your position on how much of all these different manuals have to be published in the Federal Register. Can you give me, identify quickly several examples of provisions in the VA manual that don't have to be published in the Federal Register that are not interpretations of general applicability? Sure. I think the easiest, you know, there are a lot of them. And there's, we could go into the weeds very quickly. But I think if you look at the beginning sections of the M21-1 manual, a lot of those beginning sections are just like identifying the legal rules that would govern benefits claims. And so, you know, for example, there's a section that talks about due process and it kind of reproduces the due process clause of the Constitution. And there are other sections that basically do the same thing with respect to statutes and regulations. I think that would just be an easy example. I don't think that's an interpretation of anything. And that wouldn't have to be published. You know, if you want other examples, I can just give you, you know, Section 13B11, where it talks about, you know, how agency adjudicators need to add a representative's name and address on certain forms when, you know, dealing with appeals. There's a whole list of provisions, but I don't think everything would need to be published. I think that the way to figure out what would need to be published is just by looking at 552A1. And if the particular provision of the manual announces an interpretation of general applicability under the normal meaning of that phrase, then it would need to be published. Can I just make one point on this overpublication concern? Because I think it's an important one. There is a mechanism that 552A itself creates to alleviate the burden on agencies of, like, publishing too much stuff. And what it says is that agencies can avail themselves of something called incorporation by reference. So they're basically allowed to file something short in the Federal Register that just incorporates stuff that's published elsewhere as long as reasonably available. And VA actually uses a mechanism very similar to this when it's publishing its general counsel opinions. It doesn't, although VA concedes that general counsel opinions need to be published, it doesn't actually publish the full text. It just puts a short notice in the Federal Register with a cross-reference. The PTO does the same thing with its MPEP examiner's manual. It just puts a notice there, and there's essentially a cross-reference to a Web site. And so I don't think this would be burdensome at all if you read the publication requirement for what it means, because there are ways that agencies can adapt that will not require them to publish too many things that maybe don't really need to be published because they're available elsewhere. Thank you. Thank you. Gesh Hughes. Mr. Martinez, I just want to follow up with what Judge Dyke was asking you earlier. And just because my time is short, can you just please assume that I disagree with you that the Federal Register notice and the note added to the TFR, and that all the manual provision on Partial Me is just a restatement and an instruction to the adjudicators on how to apply that note and the specific case all cited and not anything new. If it's just an instruction and a restatement, does that provide jurisdiction under 552A1D? In other words, is that restatement and instruction a rule of general applicability or interpretation that is adopted by the agency? Your Honor, I think in that case, I think it would probably be more likely to fall into the category of a statement of general policy as opposed to an interpretation, because at that it wouldn't actually be interpreting anything. It would just be sort of reproducing the interpretation from elsewhere. But the policy, the general policy that would be embodied in the fact that it appears in the manual would be a policy of instructing RO adjudicators to follow that interpretation despite udgence. And I think that would be fairly qualified as a statement of general policy. So it would still be covered by the publication requirement for 552A1, but I think it would probably be under that different prong. Okay. Let's take hodges out of this, because I think you're not giving up or you're not kind of directly answering the question that Judge Dyke and I both were trying to ask, which is if a manual provision simply restates an agency interpretation and now adopted appropriately in the federal register, is that manual provision separately reviewable under 502, or is the instrument for review a challenge to the interpretation announced in the federal register? I think probably. I want to be careful not to concede anything here, because I haven't fully thought this through, Your Honor. I think if it were literally just purely a restatement of a rule that appears elsewhere and that hasn't come under question, there hasn't been litigation about it, there's no, like, policy judgment that's being exercised with respect to it, other than just putting it in the manual. I think that would be a much harder case for us. But in a circumstance in which there is a question about whether and how that interpretation applies, I think that that would be a policy decision that the agency would make. Mr. Martinez? Sorry. I know you can't hear me interrupting. This is the bad part of doing this only by audio and not having video, is you can't see me. But you keep saying that would be a harder question, and then getting back, can you answer the question? If the manual provision simply says, go look at this regulation, because it's what covers this condition. It doesn't have any interpretation. It is simply an instruction. You know, the manual codifies a bunch of instructions to the agency adjudicators where to find the underlying source of law, and it's not the adoption of law. If that's all it says is, go look at X regulation, is that something that's in 552 and therefore reviewable under 502? Yes. But my position would be yes. But I do think that if you disagree with me on that question, it doesn't have implications for the situation we have here for the reasons that we've talked about. And why is your answer yes? My answer would be yes, because in that circumstance, the manual is itself announcing an interpretation of general applicability. And that's what 552A1 covers. How is it announcing anything when it's simply a reference to the place where the agency actually did announce and adopt the policy? And let me add, since I'm going to run out of time, let me add the second question. Doesn't that mean every single time the agency updates the manual with clear instructions that it becomes subject to a new secure statute of limitations? Your Honor, I think maybe I misunderstood the hypothetical. I think if it's just a cross reference to a regulation without, like, reproducing it, re-endorsing it, then I think that would probably not qualify. But if the manual is itself laying it out, that interpretation, again, and especially, you know, again, I don't want to exceed the bounds of the premises that you've asked me to accept, but I think by putting it in the manual that the agency is actually doing something that goes beyond just adopting the interpretation, it's instructing the RO adjudicator to follow that particular interpretation, I think the combination of those things would make it reviewable. But again, I don't think that's this case. Good. So, I have a question about 502, and in particular, the language, which section 552A1 or 553 of Title V refers, and in particular, that to which refers language. Later in that same provision, we see more customary languages that would use, like, in accordance with another statutory provision under another statutory provision. That's the kind of language we usually see. And what I wanted to know is, are you aware of any statutes with similar wording to what we see in 502, and in particular, just to make it clear, I'm talking about that, to which the statutory provision refers language? Your Honor, I'm not aware of anything else, and I don't think the government has cited anything else. And so, we think that in that circumstance, you should just apply the ordinary meaning of refers, which is to mention or allude to. Thank you. All right. We're ready for our second round with you, Mr. Martinez. And as I stated at the outset, this round will consist of going through the roster of judges again with one minute for question and answer. And I go first, and I pass. Judge Newman. I have a question that we really haven't gotten to. At the time that this legislation was enacted, there was concern within the Congress that authorizing and allowing the continuing adjustments of the manual to reflect current actions and needs and changes of circumstances, but when they added the review provision with a 60-day limit, that they thought that they were adding a path of review to areas that were not previously available for the reasons that we've been discussing, whether it was lack of finality or lack of individual applicability or whatever. So, the idea was that we do want to enlarge the opportunities to review changes in the manual, changes not in the federal register, changes before they have an opportunity to go through an elaborate procedure, and not to put accompanying that, as I said at the time, not to put any limit on who can bring a challenge such as your organization within this brief 60-day period. Now, is this something that's still on the table before us, or has the passage of time just rendered that view obsolete? Your Honor, I had a little bit of trouble hearing the question, but as I understand it, I think it was a reference to the comment in the legislative history of the 2008 legislation that seemed to make reference to the 60-day rule. If I understood that correctly, I think that that reference cannot trump either the text of the statute of the six-year statute of limitations, and it can't trump this Court's precedents in premature and block, which make clear that the six-year statute of limitations apply. You know, the Supreme Court has said just recently that arguments based on subsequent legislative history, and this would be subsequent legislative history, of course, because the 2008 legislative history would post-date the 1988 passage of the judicial review provision that we're talking about. The Court has said that that kind of subsequent legislative history should not be taken seriously, and that's from the Bostock decision. And I think, you know, the fact that a committee staffer may have written a report that included a reference to the 60-day rule on the assumption that the 60-day rule was consistent with the law, I don't think should matter in your interpretation of whether the six-year statute of limitations applies. Well, at that time, I believe it was generally understood that that 60-day rule was not subject to Article III. It was adding an increased opportunity for participation and for challenge to changes in the manual, and particularly because changes in the manual don't, and most of them, I gather, do not go through notice and comment. Your Honor, we think that the 1988 statute that enlarged judicial review and created Section 502 absolutely was a very deliberate choice. As this Court said in the 2003 Nova case, it was a deliberate choice to express a preference for pre-enforcement judicial review, and we don't think that at that time, of course, the 60-day time limit wasn't in existence yet and didn't apply, and we think that Congress legislated against the backdrop and intended to apply the ordinary six-year rule. And nothing that happened later in Congress undermines that intent. Judge Lurie? I pass, Chase. Thank you. Judge Dyke? I pass, thank you. Judge O'Malley? I have one question. Counsel, you referred generally to the pro-veteran canon. Where in the interpretation exercise that you want us to do, do you see it coming into play? Your Honor, I think the pro-veteran canon would apply to our argument based on Section 553, but not to our argument based on the cross-reference to 552. And the reason for that is that the only real dispute, I think, between the parties with respect to our 553 argument is what the meaning of the term refers is, and that word refers appears in 38 U.S.C. 502, which is the veteran statute. And so, you know, we've got, we think that the reading that's most consistent with ordinary meaning, the VA has a meaning that is not supported by any dictionaries or other ordinary meaning sources, but they say that we should read refers to mean applies. But that whole debate is about a veteran statute, 38 U.S.C. 502. We will concede that the pro-veteran shouldn't affect your consideration of what 552A1 means, because that is just the general FOIA provision or APA slash FOIA provision, which is not a veteran-specific statute. But we do think it does a lot of work for us and certainly helpful to us on the 502's cross-reference to 553. Okay, Judge Rayna. Thank you. Judge Rayna? Yes. So, the question I was asking is, Mr. Martinez, what level of deference offending would we apply in our review of the agency interpretation in these pre-enforcement actions? Yes. So, I think in general, Your Honor, they would present pure legal questions, so they'd be subject to de novo review. I think with respect to agency deference, what the agency typically does in these cases involving the manual is that it asserts that the interpretations that are embodied within the manual provisions are entitled, especially when the interpretations are interpretations of its own regulations, the agency says those are entitled to our deference. I think the fact that they make that argument just simply confirms that the agency views those interpretations as final, as meaningful, as creating legal consequences that would make them reviewable. Now, we can talk about, if you'd like, the specific new rules here. We don't think that either interpretation is reasonable. We don't think the new replacement rule interpretation is consistent, as this Court said in Hudgins. So, we don't think they're actually entitled to our deference, but as a general matter, I think they usually assert our deference when invoking manual provisions. Okay. Thank you. Judge Wallace. I pass on this line of questioning. Thank you. Thank you. Judge Toronto. Mr. Martinez, do you have any sense of how many of the 175 manual additions this year alone you would expect to fit within your 552A1 position? And one reason I guess I ask is that it feels like what might be happening here, which may well be absolutely correct under the statute, is a large shift to where we're deciding many legal issues without the benefit of rulings on the issues by the Specialist Veterans Court, which gives me at least some pause in thinking about the results. Your Honor, to answer your question directly, I don't know the answer to that. I haven't looked at all of the revisions. I think with respect to your concern about preempting the Veterans Court, I think Congress made the judgment in 1988 that it wanted you to be the first court that folks would go to when these kinds of challenges to, you know, generally applicable rules are brought. And that's the judgment that Congress made, and that's why we're here instead of in the Veterans Court, of course. Thank you. Judge Chen. I pass. Judge Hughes. I pass. Judge Stowe. I pass. Okay. And Mr. Martinez, you've got about a half minute left on your regular time before you start hitting rebuttal. So if you want to take a minute to conclude this portion of your argument, and we'll save the remainder for rebuttal. Thank you, Your Honor. I guess what I'd just say is in concluding here, I would just say that although there's a lot of tricky administrative law questions here, I think ultimately this case really does turn on the ordinary meaning of the cross-reference to 552, its reference to 553. I don't think the government has come forth with any textual reason or historical reason why that phrase of general applicability means binding. And even if it did mean binding, we think that it is appropriate. It is binding. The manual provisions are binding here on the RL. Similarly, with respect to the cross-reference to 553, the issue turns entirely on the meaning of the word referred, and I think the ordinary meaning supports us. Thank you, Your Honor. Thank you, Ann. Your rebuttal time remains intact. Mr. Bruskin, you have three minutes uninterrupted. Thank you, Your Honor. VA staff manuals are critical tools for VA in its mission of caring for veterans. VA uses the online M21-1 adjudication manual to quickly distribute guidance to its frontline benefits claims adjudicators. However, because veterans may obtain de novo review of their claims from the board, which is not bound by the provisions in the manual, manual provisions are only the starting point for the agency and veterans alike. In this case, the court must decide if it can review interpretations in the manual under Section 502, which Congress designed in the BJRA as a limited route for veterans to challenge binding VA actions like regulations and presidential general counsel opinions. The question of the court's jurisdiction here, we believe, largely boils down to where the court draws a line between 552A1D and A2B. Nova says drawing this line is easy because any interpretation that is not particularly applicable is generally applicable, and so it must be published and can be reviewed. But for over 50 years, courts, including this one, have grappled with the notoriously difficult line between A1D and A2B. The reason this line is so is because there is no clear line drawn in the text of FOIA. Nova's textual approach to A1D does not lead us to the right answer because it leads to silly results. Nova argues that general interpretations and general policies apply to more than named persons and so must be published, whereas policies and interpretations directed only to particular people need not be published. Nova thus argues in its replies, it must, that there are policies of particular applicability that are covered by 552A2B, but it does not identify any. Moreover, the APA only exempts general policies from notice and comment rulemaking in 553, meaning that the policies of particular applicability that Nova theorizes must require notice and comment, while general policies would not. Obviously, that makes little sense, which is why relying solely on the dictionary here does not lead us to the right result. And that is why courts have almost unanimously looked to other provisions in 552A1 to determine where the publication requirement attaches, and nearly all have looked to the proviso added in FOIA that materials not published as required cannot adversely affect a member of the public. We urge the court to do the same here, but instead of applying a subjective test, the court should decide where the publication requirement attaches by looking at whether the agency action binds the agency and can, therefore, and as an objective matter, adversely affect a member of the public. Doing so is consistent with FOIA's focus on ensuring the public is made aware of agency actions that will or can adversely affect them, 50 years of FOIA precedent, and the Supreme Court's decision in Morton v. Ruiz. It's also, most importantly, consistent with the VJRA, which is designed to channel most challenges through the administrative claims and appeals processes up through the Specialized Veterans Court, with a limited exception for direct review of regulations and Presidential General Counsel opinions, which are binding on the entire agency, but not for interpretations that do not conclusively set forth the agency's interpretation of the law. Thank you. I will pass on my question, turn then to Judge Newman. Well, I'm still concerned about this aspect, as Counsel just mentioned, the limited exception for direct review, which bypassed the Specialized Court, which is indeed charged with and obviously experienced in the procedures involving veterans. So, we have a limited exception for direct review, which has a very limited and tight limitations period for that limited exception. Now, what we're talking about is that we retain the limited exception for direct review, but we open it to six years instead of 60 days, and try to understand the legislative policy, the public policy, the veterans policy involved here is a matter of concern. So, my question for Governor and Counsel is, how do you see how Congress intended this limited exception for direct review? Well, I think the legislative history of the VJRA makes clear, because there's references in both the House and Senate side, that what they had in rules like regulations and Presidential General Counsel opinions, which set forth how the entire agency interpreted a statute or a regulation would be reviewable by this court on pre-enforcement review, because there's no reason to require a veteran to go through the process of obtaining a RO and a BVA decision when you know how the BVA is going to interpret the law, because the agency has set forth in a binding statement. But where there is no such binding rule on the board, and the board is going to take a de novo review of things, the VJRA sets forth very intricate and important administrative channels that channel each of those challenges up through the board and through the veterans court, not only to build a record, but to gain the benefit of the expertise and the knowledge that the board judges and the judges at the veterans court bring to a question before this court steps in to review it. So I think it's entirely consistent with the VJRA to limit this court's review and channel more review into the appeals process. So when you say the limit, are you talking about a statute of limitations? Are you talking about preserving the 60-day period? I'm discussing both, Your Honor. I think the 60-day period is recognition of the fact that most reviews through the VJRA is designed to go through the VA first, and then to the veterans court, and that the option for coming to the federal circuit should be limited. It's both limited by Congress with respect to the cross-references in Section 502, and this court obviously believed in 1993 that it should also be limited in its time period, which makes sense because what you don't want is a situation, I think that Mr. Tangent represents here, where a veteran has an opportunity to appeal the application of something to their claim. They have the chance to appeal to the board, but instead they don't. They let it become final, and then they show up and ask for pre-enforcement review and claim they have standing because they were harmed. I think that really perverts the mechanism set up in the VJRA through which Mr. Tangent has the opportunity to challenge manual provision at the board if he believed it was an error. Judge Lurie? I pass, Chief. Thank you. Judge Dyke? Thank you. I have three questions. I hope we can get to all three of them. The first is, you have consistently argued for our deference to provisions in the manual, and I do not understand how that position is consistent with your view that the manual doesn't reflect an official agency position and that it's not final. The proceedings with respect to the manual itself are certainly concluded. You say it's entitled to our deference. How is that consistent with your position on finality and, indeed, your position about reviewability generally? Well, to the extent that the agency asks for deference to its interpretations in the manual, as the court in Kaiser sets forth and reflecting Paris, it's not the agency's interpretation that becomes the final word on what a statute or regulation means. It's the court agreeing with the agency. I don't think that asking for deference because the agency has long interpreted something in a certain manner... Isn't your position that the manual provision represents the official position of the agency, which should earn our deference, inconsistent with the notion that that's not the final agency action? Well, to the extent that the Secretary agrees that that position should be entitled to deference, and that argument is made in court, but I would point out that at that point, that manual provision is subject to review by the court, and so it does not turn other manual provisions into final agency action or make them otherwise binding, simply because before a the tribunal to take a look at how the agency has interpreted this one statute or regulation in the manual provision. Okay. My second question relates to the Supreme Court's decision in Hawks, where the court suggested, and this has been repeated in various circuit decisions also, that the court has taken a pragmatic approach to the question of finality, and you say, well, that's not true because this circuit decision in Joshi says it's not a pragmatic inquiry, but that case just involved possible reputational damage. So if in fact we have to take a pragmatic approach here to this question of finality, as a practical matter, isn't this manual, these provisions in the manual, effectively as a practical matter binding in a vast majority of cases? I have two responses, Your Honor, and one is to question the premise of it. Although Hawks does state that there should be a pragmatic approach, there's been inconsistent interpretation of what that means in the D.C. Circuit. So there are cases like Appalachia Power in the NRDC case, and there's Joshi, and although that is about reputational harm, the court in Joshi was relying on the reliable sprinklers case, in which the party at issue had to voluntarily comply with the action at issue or risk enforcement. So there's more than simply reputational harm that courts have found insufficient for finality. But the second point I'd like to make in response is that the notion that having to go through the board process and appeal to the Veterans Court, if a veteran chooses, is somehow renders manual provisions sufficiently final to suggest that the VJRA itself made essentially any agency action by the VA reviewable. Because what Your Honor's question was premised on is the idea that because you have to go to the board and appeal, that somehow it is a practically binding on the veteran. But that is exactly what the VJRA tells us. The point is because so many of these claims are resolved as a practical matter at the board level, doesn't that weigh in favor of reviewability under the Supreme Court's pragmatic approach in Hawks? No, Your Honor, because I think that is allowing a policy concern to creep into what Congress had in mind in 1988 when they set up these review mechanisms. And the fact that 94 percent of claims are not appealed to the board without any insight into why the vast majority of them do not appeal does not give an indication that an otherwise limited decision like a manual interpretation that does not bind the ultimate decision makers somehow is transformed by the decision by certain veterans not to appeal to the board. Okay, and my final question relates to the six-year time limit. And we have various other federal statutes, including the Hobbs Act and other provisions, that impose a specific 60-day time limit on review of agency action. Doesn't the fact that Congress didn't include that sort of 60-day limit in this statute suggest that the general statute of limitations governs? Well, I think it suggests that the 2401A certainly applies, and we don't dispute that. But I think as Judge Toronto correctly noted, 2401A only sets out an outside time limit on when cases are petitioned. Excuse me for interrupting, but I don't think you're answering my question. The question is, when Congress and other statutes impose a 60-day limit and didn't do so in this statute, isn't that evidence that the general six-year statute governs? And I think that's reading too much out of the congressional silence. And there are many examples of times when Congress does not include a statute of limitations and where a court finds a 2401A does not apply. And courts are instructed to, in those circumstances, borrow statutes from other analogous situations. So I don't think that there's support for the notion that congressional silence should lead a court to adopt any particular statute of limitations unless it determines that that statute of limitation comes from an analogous statute. And the Hobbs Act and many of the statutes we cited show that the court's rule is consistent with generally how Congress wants the Federal Circuit and other courts and appeals to review agency action. Judge O'Malley. I think that that covered the landscape for me. Thank you. Thank you. Judge Rayner. Yes. I have a brief question. Mr. Brewster, why did the VA publish a notice of proposed rulemaking with respect to the new stability rule before it inserted a version of that rule, the same rule, directly into the manual if, as you allege, the manual provisions don't require notice-in-common rulemaking process? Well, because I think we're referring to 5055, Your Honor, the diagnostic code at issue in Hudgins. Am I understanding your question correctly? 5257. I mean, I'm not familiar, I suppose, enough with what they put in the Federal Register. Certainly, to the extent that they were changing a regulation or making a substantive change, they would have to put something into the Federal Register to do so. I think building off Judge Hughes and Judge Dykes' questions, it's entirely permissible for the agency to then simply republish that in the manual to ensure that all of the adjudicators of the RO have easy access to the rules that need to be applied. Okay. Thank you. Judge Wallach. Yeah. I have one brief question for the government that I think fits in here, and that is, would the DOJ have any reason to object to this court simply repealing an internal rule, which is Rule 15a? Would we object? Well, I think as we raised in our response to the petition for review, there are processes that the court typically goes through to change internal rules of that nature, which permit, I believe, the public to weigh in. I think that there could be concern that DOJ and or VA, DOJ on VA's behalf, would express with repealing the rule and permitting veterans like a Mr. Tangent or the veteran like in Hilarion to, you know, sort of partially go through the Chapter 72 processes, but then allow things to become final, and then many years later, come to court. Thank you. Judge Schirante. Thank you, Mr. Brodsky. I want to return to the Rule 15f question. Do you have any examples of any other court's adoption of a rule under 2071 that requires a filing in less than the time beyond which Congress has said the filing is too late? And, relatedly, any cases addressing such rules? My recollection is that neither side's brief point identified any case involving such a rule or, indeed, to any such rule. I don't, Your Honor, and it's not for lack of looking, Your Honor. I will be candid. I think what that reflects is that this is a unique situation, and so there's no clear-cut precedent that suggests that the court is precluded by the language in 2401A from creating its own claim processing rule if it believes that's appropriate and necessary to conduct- But I wonder, Mr. Brodsky, and if I'm putting aside the absence of cases and focusing on the even one worded like this one merely to say what is too late is so uniformly understood to declare everything timely that is less than that date that no court has ever thought that it could make a rule to demand filing in less than that amount of time. I won't quibble with the, sort of, that the Federal Circuit occupies a unique role in the VA system, and so the fact that other courts have not undertaken what the Federal Circuit, the specialized court, has undertaken with respect to this unique system is not, I don't believe, overly persuasive evidence that other courts have, without saying so, interpreted 2401A to preclude local rules. And, in fact, the few cases that we were able to find sort of addressing how 2401A fits in with other statute of limitations agreed that it sets the outside time limit only. And just finally on that, do you disagree with Mr. Martinez's statement that if that's right, has any of the cases indicating that view involved an effort to demand a filing in less than the six-year period? The answer to the first question, Your Honor, is yes, I do agree. The cases that I reviewed showed that it is, I believe, uniformly adopted for APA, and I am not aware of any decision that grapples with the unique question facing the court today. Thank you. Judge Chen. Thank you. My questions are looking to explore the board's relationship with the rest of the agency, and my initial question is why is it that the VA would create a system in which you would go through all the trouble of producing all these different manual provisions, providing all these different interpretations that bind one arm of the agency, that is, all the RO line adjudicators, but not bind another arm of the agency, and that is the Board of Veterans Appeals? Sure. Well, as Nova likes to point out, the RO adjudicators are not lawyers. So they are not equipped to review statutes and regulations and independently determine their meaning and their application. And so the VA has determined that to ensure uniformity and consistency in its decisions in the regional offices, it made sense to put together a manual. Clearly, it did not need to put all these things in one centralized manual, and it could have required regional office adjudicators to call back to the board members. But the board members are not bound to follow all of these interpretations set out in the manual, right? Right. And they're judges. I mean, they are lawyers, the BVA judges. And so they are... How often do those board members not follow or elect to not follow the manual provisions? Is it common? Is it extremely uncommon? Do you know? I don't know how to categorize it as common or uncommon. We certainly cite a number of board decisions rejecting manual provisions and applying the different interpretations. And so it is not extremely uncommon. The vast... What does the VA secretary do under those circumstances when it has the board, from time to time, electing not to follow the provisions set forth in the manual, in fact, doing something contrary to these interpretations in the manual? Sure. Well, the VA... Are there any controls that the VA secretary has on board decisions? Should it disagree with these sorts of actions that are contrary to the manual? Sure. My understanding is that if there develops a disagreement in more than perhaps one or two cases between the board's view and the VBA's view as put forth through the manual, that leadership of VBA and BVA would need to sort of determine. And I think that would be the right situation, perhaps, for a general counsel opinion to set forth the secretary's interpretation and bind both the RO and the board to that interpretation. So when the board issues a final decision that is contrary to and conflicts with a VA manual provision, that board decision represents the final agency action. Is that right? For that veteran, yes, Your Honor. And there's no further review at the VA or reconsideration of that final board decision? That's correct. And if it is beneficial to the veteran, the VA cannot appeal to the veterans court. Does that make the board members officers? I don't know if it makes them officers, but as the court addressed in the Ashford decision, there's nothing wrong with announcing new principles in an adjudication. And the agency has set up its system in the VJRA, ensconced the system whereby board judges could announce new principles in adjudications. And there's nothing erroneous about that sort of mechanism. Okay, thanks. Judge Hughes. Mr. Breskin, I'm going to turn to the knee stability issue, which we haven't really talked about so far. And I'm going to ask it as a hypothetical because I don't want to get into a big debate about what the rule actually says or doesn't say or how you categorize it. Let's just assume that an agency recognizes the need to change criteria. And it decides that in the first instance, it's going to publish the change criteria in the manual. Is that the type of adoption of an agency policy that 552A1B refers to, and therefore would be revealable under 502? I don't want to concede that would be true in every conceivable circumstance. But I think if there is a substantive change to the rating criteria in the diagnostic code, then I think the answer would be yes, Your Honor. That would be something that should be undertaken through notice and comment. So then I'm going to ask you the more specific, and this isn't a hypothetical anymore. VA actually did undertake to do notice and comment on diagnostic code 5257 and published a proposed change in the Federal Register, went through notice and comment, and then withdrew it and republished the same rule in the manual. How is that, you know, the agency's seeming recognition that this should have gone through notice and comment, and then changed to, of course, midstream apparently and just published in the manual. How should that insulate the manual provision on the new stability rule from review under 502? Because I assume you would agree that if you've gone through with the notice and comment and actually published the new interpretation in the CFR or in the Federal Register that it would have been revealable under 502. Yes, Your Honor. You know, I don't know the and decided to put it into the manual. And so I don't want to say that there's no justification for that decision and there was no, you know, reconsideration of whether or not the rule was truly substantive or wasn't, and therefore should be put into, it can be put into the manual. What I would point out, though, is that we're not suggesting that a veteran affected by this could not have come to court and said, hey, 5257, your interpretation of it in the manual is a substantive rule. It should have gone through notice and comment. And Federal Circuit, I want you to invalidate it for failure to do so. Now, of course, NOVA has not made that argument, which, you know, as Judge Toronto noted, suggests some possible divergence between NOVA and the veterans. But again, I think, you know, the Federal Circuit does have jurisdiction to consider whether or not a rule that the VA has put into the manual should have been promulgated through notice and comment. And is that not how we should, even though that's not the argument NOVA is making, isn't that really what they should be challenging here instead of the merits of it? Because if we determine that it's a rule either of substantive change or even an interpretive rule that should have been published, it should have gone through that process, and it hasn't. And so the rule, as announced, is deficient. Compared to what I think you would say is a different circumstance with the partial need, which I assume your view is it just restates already published rules. Yeah. Yeah. I mean, I think embedded in the question was a suggestion that if it was somehow interpretive, that it should have gone through notice and comment, which, you know, I would disagree with, right, because if it's an interpretive rule, it should have gone through notice and comment. If you misheard me on that, I didn't mean that interpretive rules obviously have to go through notice and comment, but they do have to be published, right? They have to be published. Well, it depends. It depends. It depends. Okay. I don't want to quibble about this. This is not the important part of the case. But let me just clarify. So because I think you understand what I'm getting at is that I'm that your position that the manual provisions are not revealable would allow the agency to hide provisions, and I'm not accusing anybody of doing this, but it would allow the agency to hide provisions that should have gone through notice and comment or otherwise been published in the Federal Register, and therefore would have been challengeable under 502, to hide them in the manual and under your position not be revealable. And it seems to me that if the agency has undertaken such an action, the fact that it's in the manual is not determinative of reviewability. It's whether it's something that should have been published, either under 552A1 or 553. No, I agree with that. I just think that the fact is that putting something in the manual doesn't hide it from review. It's still subject to 502 and the argument that it should have gone through notice and comment. And the Federal Circuit can review that and say, yes, this should have gone through notice and comment, and so it's invalid and invalidated that way. And also, just by putting it in the manual does not suggest that the interpretation in the provision is somehow hidden from judicial review because the other Chapter 72 process will eventually shine light on that judicial provision if it is, in fact, erroneous. Thank you. I don't have any more questions. Thank you, Judge Stowe. Judge, you fully covered the questions I had for Mr. Bruskin, so I pass. Thank you. All right. Now we'll undertake what is called our second round for you, Mr. Bruskin, and that will consist of going through the roster of judges. If they have questions, those questions and answers should try to be kept to a minimum of approximately one minute. I will pass on my questioning. Judge Newman? I have no further questions. Judge Lurie? I will pass. Judge Dyke? I have one question, and that is about the Kaiser case. And if I understand it, the government in Kaiser apparently agrees that board decisions are not entitled to hour deference as compared to manual provision. Is that your position that board decisions are not the official position of the agency and are not entitled to hour deference? To be honest, Your Honor, I'm not sure. Is that an argument that was made in the Kaiser case? And this is a slip of opinion at 29. The Solicitor General suggested oral arguments. The answer in this case might be no. And that is, he explained all 100 or so members of the VA board act individually rather than as panels, and that roughly 80,000 annual decisions have no precedential value. Do you agree with that? Yes, Your Honor. Okay. But that doesn't mean they can't announce new principles, right, as the court recognized in Ashford. But as a board decision, it is not precedential and binding on other, you know, board decisions for the agency. It's not the official position. Except in that one case. It's not the official position. It is in that one case. It's not the official position of the agency. Not as a precedential matter, no, for other cases. Judge O'Malley? I will pass again. Thank you. Judge Rayna? I pass. Judge Wallach? I pass. Judge Taranto? I pass. Thank you. Judge Chen? Just a quick question, following up on my earlier question. It sounds like in the manual, the VA secretary sets forth interpretations that it then later seeks our deference on. But at the same time, the BVA is not at all bound by or controlled by those interpretations the VA secretary adopts in the manual and seeks our deference for in the courts. So does that make the members of the BVA? I believe members of the BVA are employees, but I don't know that I can offer an official response for what their title is, Your Honor. Right. Your argument or your position is that they are employees and they're not officers. And I'm just wondering, why is it that that is the case when from everything I'm hearing in this case, the BVA can essentially do whatever it wants, certainly at least with respect to all of these carefully scripted out provisions that are set forth by the agency through its manual on interpreting statutes and regulations? Well, I think because of the desire to give veterans multiple different bites at the apple to demonstrate that someone has made an error in an interpretation. And so for the vast majority of interpretations, the board is not bound by the view of another part of the agency, but takes an independent look. And this provides multiple layers, multiple sets of eyes to make sure that the agency is making the correct call on how something is interpreted and how it is applied. And so I think it is part of the paternalistic system. And I believe the VGRA, you know, in lead up to it, there was consideration of doing away with the board, but it was decided not to do that. And it was adopted as part of the system to ensure that veterans have multiple opportunities and multiple people who look at their cases to make sure that they get it right. No further questions. Thank you. Judge Hughes. Yes, I just have one question. So I'm going to go back to the partial mutual. Let's just assume I disagree with Mr. Martinez and think that that manual provision is just a restatement and instruction of the Federal Register Notice and the note added to the CFR. Is there anything, and I would agree that it would have been proper under 502 to challenge the Federal Register Notice. Is there anything in your view that would prevent them from amending their petition to challenge the interpretation as announced to the Federal Register Notice as opposed to the manual provision and therefore allow us to review it in this case after that amendment? I think as a general matter, under 502, no, they would not be prevented from making that sort of adjustment. I think part of it might land on where the court comes down on rule 15F and the application there. I think, you know, before answering conclusively, I'd need to see exactly what it is they're challenging. But yes, as a 502 matter, things that are published in the Federal Register are, under our view, 502A1D reviewable by this court and would cover something published in the Federal Register. Okay, thank you. Thank you. Judge Stowe. I pass. Okay, thank you. Well, Mr. Breskin, you've got about 17 minutes left of time, so don't feel compelled to use all of it, but the floor is yours, and judges may continue to interrupt their own choice. Sure. Well, I'll give anybody an opportunity to interrupt me up front, but if not, I'd like to briefly address the alternate theory that Nova suggests here, which is that the reference in 502 to 553 opens up this court's jurisdiction to the review of anything that's referenced in Section 553, even by way of exclusion. And, of course, no decision from this court has ever read a 502 in that way, and we would suggest it's an illogical reading because there was obviously a choice Congress made in making sure that things subject to 552A1D are reviewable and not referencing things covered by 552A2. And yet, the reference in 553 to the exclusion of interpretive rules would allow this court to essentially review everything that the VA published, any statement made by the VA, whether interpretive, whether only of particular applicability. And I think there's really no support, and I think it reflects the sort of attempt to isolate in a vacuum the words of the statute and make a purely textualist argument as to how it should be interpreted. The court is here to interpret the VJRA, and so it's important to keep in mind what the goals were when Congress enacted the VJRA. What were they trying to accomplish? It's clear they were not trying to open up everything the agency does to APA review, yet that's what NOVA's reading of 553 would suggest. Unless the court has further questions, I will cede the remainder of my time and just respectfully ask that the court either dismiss the petition for lack of standing or find that the DAV decision correctly found that there is no Section 502 review for interpretations that are published in the manual. Thank you, Your Honor. Thank you. Mr. Martinez, you have eight minutes remaining for rebuttal, which you may or may not be interrupted by judges at their discretion. Thank you, Your Honor. Just a few comments on the 552 issue finality, the time limit issue, and some of the policy concerns. First of all, Mr. Bruskin opened his presentation by saying that the textual problem in this case is the need to draw a clear line between 552A1 and A2. We would respectfully submit that that's a kind of reiteration of what is essentially the mutual exclusivity argument that was made below and that I think it's very important to note that the VA has already affirmatively disclaimed that argument. If you look at page 22 of the VA's exposition brief to Sir Shirari in the Gray v. Wilkie case, the VA specifically said, and this is at the bottom of page 22, the criteria that 552A1 and A2 establish overlap. They overlap. In other words, there's not a clear line between A2 and you can have things that fall into both categories. Secondly, with respect to 552, Judge Chen and Judge Dyke, I think, both asked questions regarding the strangeness or the weirdness of a system in which interpretations, manual provisions are binding on the regional office but not on the board. And I think it's, you know, the weirdness of that is exacerbated by the fact that the board decisions, once they come out, they only apply in that individual veteran's case. And so although Mr. Bruskin says that it's accepted administrative law practice to issue, you know, broad statements of law in adjudications, that's true. But any statement of law issued by the board is not binding on anyone. It's not binding on the regional office the next time around. It's not binding on VA and litigation. It's not binding on the board itself the next time the next case comes across. And so I think it's a mistake to think of the board as being some sort of superior agency that is entitled to reflect the real position of the VA. What's really going on here is that the real position of the VA is reflected in the manual. And although they have created a weird system in which their appellate review body is allowed to ignore certain interpretations, I don't think that changes the fact that the manual provisions are binding on the regional office adjudicators and beget final decisions. And I think, you know, this sort of wrinkle about the board's role and the effect of its decisions, I think, just plays up the arbitrariness of VA's interpretation of Section 552. There's really no reason to think that Congress would have thought that a rule qualifies as being of general applicability if it binds the regional office and the board, even if it doesn't bind other entities within the agency, like the general counsel or the secretary. And so this whole bindingness requirement really is just invented for purposes of getting rid of these 502 cases. With respect to finality, Your Honors, I think Judge Feig had it exactly right, pointing to the Hopps case, and that a pragmatic approach is required here. And I just want to make, both in the DAV litigation and in the Gray litigation, I think this language was quoted in the court's opinion in both cases, VA conceded that the manual's effects are, quote, real and far-reaching. And so as a practical matter, as a pragmatic matter, in the real world, everyone knows that the manual provision is enormously significant, both because it has at least the final decision 94% of the time, and I would say because it exerts a powerful gravitational pull on board decisions. With respect to the statute of limitations, a couple of points, Your Honor. Judge Newman asked a number of questions about the 60-day limit, and I just wanted to clarify that that 60-day limit did not appear in the original statute, in the Section 502. It didn't appear in the legislative history of that statute or in its text. If you look at this court's ground decision from the late 1990s, what the court seemed to imply is that it enacted the 60-day rule as a matter of its local rules because it was under the impression that otherwise there wouldn't be a limitations period. And what the court's later decisions make clear and what VA has conceded is that, in fact, there is a limitations period here. It's the six-year limitations period in Section 2401A. And so I think it's important just to clarify that, and I think the court was not, you know, the court was operating in what it may have thought was a situation which it needed to borrow a statute of limitations or come up with one when we now know, as everyone agrees, it didn't need to do that. VA cites some of the other cases from other contexts involving courts that have borrowed statute of limitations. Those don't apply here because, as VA concedes here, the six-year statute of limitations does apply to these 502 actions. In all of the cases that VA has cited where a court looked elsewhere or borrowed a statute of limitations, it did that because there was no backstop provision that applied. There was no statute of limitations. This case is different. Finally, I think, on the time limit, I think Mr. Breskin conceded that VA has looked far and wide for precedent for something like this where a local rule sort of unilaterally cuts back on the statute of limitations that's been enacted by Congress. VA was not able to find any such rule. We haven't found one either. So we think this would be a totally unprecedented situation if this court were to uphold its 60-day time limit in the face of a command from Congress. We also think it would be a recipe for some chaos if that rule were adopted more generally. As we've discussed, the six-year statute of limitations applies to all APA actions, unless there's another statute with a different specific statute of limitations. So under VA's approach, every district court in this country, every circuit court in this country, could, by a local rule, adopt a shorter time limit that would create a different rule that would apply to APA actions, ordinary APA actions, depending on, you know, whether you're filing in this circuit or that circuit or this district or that district. And the same principle would apply to other types of cases too. I don't think that that recipe for chaos is consistent with the Rules Enabling Act or with the intent of Congress. Finally, a couple points on policy, Your Honor. There was a concern that was raised by VA about the disability claims process that Congress set up. Well, that argument is completely at odds with the government's argument on standing. As I understand the government's argument on standing, the only veteran, the only veteran who is able to bring a, who has standing to bring a 502 action, is a veteran who has already filed a claim and has that claim pending in front of the RO. The government's position is that once the claim, before the claim is filed, you can't, you don't have standing. After the claim is on appeal to the board, you don't have standing. And so their argument is essentially that the only person who's actually able to bring these cases is the person who already has the claim. And that can't be consistent with their other theory, which is that, you know, you don't want to let, you shouldn't let Section 502 trump the ordinary disability claims process. Finally, Your Honor, a policy point about Judge Rayner's question about 5257 and the discussion about the new stability rule in this case. I think it's important to make very clear what happened here. The agency published a notice of proposed rulemaking because it wanted to enact a substantive legislative rule that would have the force and effect of law that would interpret a diagnostic code or that would apply to diagnostic code 5257. In response to that notice, it got negative comments from a lot of people. The agency then apparently decided that going forward with the 553 process, the notice and comment process was going to be too difficult. And so instead what it did was it abandoned the legislative rulemaking process. And it decided to just insert essentially the same rule or something very close to it into the manual. And it did that because it wanted to have its case and eat it too. It wanted to essentially have a rule that was de facto binding, even though it's technically not binding. And it wanted to have a rule that under its theory would not, could not be challenged in court under Section 502. I would respectfully submit that that kind of scenario where the agency is evading the notice and comment rulemaking processes that Congress has set up and is instead embodying what are enormously important rules with far-reaching significance into the manual, that is exactly the kind of problem that Section 502 is designed to solve. And so I would respectfully ask you, as you look through the thorny administrative law and FOIA issues in this case, to also keep in mind the human dimension of this case. Congress wanted this court to protect veterans when VA loses its way, when VA passes illegal rules. And we would respectfully ask you to allow this case to proceed to the merits. Thank you, Your Honors. Thank you. Thank you. Before we conclude, I would just like to express our thanks to the two advocates this morning for their cooperation in working through this process with the clerk's office and the court. Your contribution is very much appreciated. And, of course, I'd also like to express our gratitude to our terrific staff, led by Pete Marksteiner, our Circuit Executive, Jaret Perlow, our Chief Deputy Clerk, Riley Toussaint, Kevin Gates, and, of course, our voice, Michael Lichtenberg, for everything they did in making this proceeding go smoothly and, indeed, also for their herculean efforts for these many months, which have allowed our court to continue to operate at full speed during these challenging times. And with that, the case is submitted, and this concludes our proceeding for this morning. Thank you all. The Honorable Court is adjourned until tomorrow morning at 10 a.m.